IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JAMES WORLEY,

                Plaintiff,

v.

MICHELLE BREWER, ELIJAH CHAMBERS, and JENNIFER EVANS,

                Defendants.

Case No.: 3:16-cv-2412-AC

**OPINION AND ORDER**

**ACOSTA, Magistrate Judge:**

*Introduction*

Plaintiff James Worley ("Worley") brought claims under 42 U.S.C. § 1983 against Michelle Brewer and Elijah Chambers, Oregon State Police detectives, and Jennifer Evans, an Oregon Department of Human Services ("DHS") caseworker (collectively "State Defendants"), alleging State Defendants violated his rights under the Fourth and Fourteenth Amendment. Worley also brought state-law claims for false arrest, malicious prosecution, and negligence. In a previous Order (ECF No. 50), Judge Brown granted State Defendants' Motion to Dismiss as to all claims except for Worley's claim under § 1983 alleging Defendant Evans ("Evans") fabricated evidence in violation of Worley's Fourteenth Amendment substantive due process rights. Currently before the court is Evans's Motion for Summary Judgment as to Worley's remaining claim. For the reasons set forth below, the court grants Evans's motion.[1]

---

[1] The parties have consented to jurisdiction by magistrate in accordance with 28 U.S.C. § 636(c)(1).

OPINION AND ORDER – 1

*Background*

In 2000, Worley married Heather Laughlin. Laughlin had a minor daughter, HL, from a prior marriage to Kenneth Cole. (Pl.'s Compl., ECF No. 1, at 5.) In January 2002, Worley and Laughlin had a son, SW, while living in Deschutes County, Oregon. (*Id.*)

On September 19, 2006, the Lane County Circuit Court entered a Judgment of Dissolution dissolving the marriage of Worley and Laughlin. (*Id.*) Following the divorce, Laughlin, HL, and SW lived together in Lane County. Worley had regular visitation with SW and HL. (*Id.*)

In March 2008, Worley married Joanne Davis.[2] Davis had a minor daughter, AD, from a prior marriage. Worley and Davis have two children together: a son, JW, and a daughter, also JW (the "children"). (*Id.*)

In February 2012, Worley, Davis, AD, and the children moved to Gresham, Oregon. Around that time, SW told Worley he wanted to live with Worley and Davis. When HL learned SW might possibly move, she became upset and stopped visiting Worley. (*Id.* at 6.) On July 12, 2012, HL told Laughlin and Cole that Worley had sexually abused her in the past. (*Id.* at 7.)

On July 19, 2012, Laughlin took HL, who was then 15 years old, to the Oregon State Police in Lane County and spoke with Detective Chambers. (*Id.* at 8.) That same day, Evans, a DHS caseworker in Gresham, Oregon, began an investigation into the safety of the three children residing in Worley's household: AD and the children. (Pl.'s Resp. to Defs.' Mot. Summ. J., ECF No. 100, at 2 ("Pl.'s Resp.").)

Upon assignment of the case, Evans performed a "social media check" on Worley. (Decl. of Daniel Snyder, ECF No. 101-2 ("Snyder Decl."), Ex. H at 134:5-10 ("Evans Dep.").) Her

---

[2] For purposes of clarity, the court will refer to Joanne Davis, now Joanne Worley, as "Davis."

OPINION AND ORDER – 2

search revealed two videos posted on a social media website; one video showed Worley dropping his step-daughter, AD, and daughter, JW, off at school ("driving-to-school video"), and the other showed Worley and AD sitting next to each other at home. (*Id.* at 37:9-18.) Evans claimed the driving-to-school video depicted Worley "inappropriate[ly]" kissing AD on the lips to say goodbye as she exited the vehicle. (*Id.* at 29:15-25, 39:15-22, 88:11-14.) Evans construed Worley and AD's behavior in the second video as flirtatious and atypical because they were "sitting very close to each other . . . rubbing up against each other and giggling and moving and acting silly." (*Id.* at 46:1-10, 44:21-25.) Evans found the interactions concerning because AD had a prior history of sexual abuse by her adoptive father, which Worley was allegedly aware of. (*Id.* at 46:17-19.) Shortly after viewing the videos, Evans forwarded a link of the driving-to-school video to Detective Chambers, but she did not download the videos to her work computer because DHS did not have the ability to do so and she expected Chambers would retain the video. (*Id.* at 47:24-48:12, 49:9-17, 66:7-9.) Evans believed the videos showed Worley engaging in sexual "grooming-type behaviors" toward AD. (*Id.* at 88:11-14.)

In describing the driving-to-school video, Chambers noted that Worley was filming from a hand-held device while narrating, the vehicle stopped, and "the teenage girl went to get out and gave Mr. Worley and . . . also the grade schooler both a kiss on the lips as if to signify good-bye." (Snyder Decl., Ex. K at 31:10-18 ("Chambers Dep.").) Chambers did not find the kiss was of a sexual nature, and he did not retain the video or later turn it over to Worley's defense counsel because he did not see anything of a criminal nature in the video. (*Id.* at 32:2-24.) Rather, Chambers found the video depicted a normal family interaction. (*Id.* at 32:25-33:1.)

On July 19, 2012, the same day Evans began her investigation, Evans put a "safety plan" in place for the Worley family. (Snyder Decl., Ex. A at 2, 5.) The plan lasted for approximately

OPINION AND ORDER – 3

five months and required Davis to supervise Worley's contact with their children. (*Id.* at 2.) On July 20, 2012, Evans called Davis and told her that Worley had to move out because he was a "monster," claiming Worley had put his hand on AD's thigh and kissed her on the mouth. (Decl. of Joanne Worley, ECF No. 105, ¶ 3.) AD later stated that she never told Evans that Worley touched her on her thigh, only that he would put his hands on her knee and she never felt it was inappropriate. (Decl. of Amy Bertrand, ECF 80 ("Bertrand Decl."), Ex. 2 at 1-2, 14 ("AD Interview").) AD also reported that kissing on the lips, nose, cheek, and head were normal ways of showing affection in her family and she never felt uncomfortable around Worley. (*Id.* at 14-15.)

On May 21, 2013, Evans testified in a Lane County family court hearing that she was aware of a video on the internet that showed Worley driving his kids to school unsupervised, and that she viewed the video before the safety plan was put into place. (Snyder Decl., Ex. A at 5.)

On December 17, 2014, Worley was indicted by a grand jury in Deschutes County on numerous counts of felony rape and sex abuse against HL and SW. (Pl.'s Compl. 14-15.) On December 30, 2014, Worley was arrested in his home in Gresham pursuant to an arrest warrant issued in the Deschutes County case. (*Id.* at 15.) On January 23, 2015, Worley posted bond and was released from jail under house arrest. (*Id.*)

On April 17, 2015, Worley was charged with additional sex-abuse charges in Tillamook County. (*Id.* at 16.) On April 20, 2015, Worley was again arrested at his home in Gresham. Worley remained in custody on the Tillamook County charges for approximately ten months pre-trial. (*Id.*)

On February 1, 2016, Worley's criminal trial began in Tillamook County. (*Id.* at 17.) On February 23, 2016, Evans testified concerning the videos. (Snyder Decl., Ex. B at 1.) In

describing the driving-to-school video, Evans stated Worley and AD were "riding very, very closely in the car," and Worley "kiss[ed] her directly on the mouth when they were saying goodbye." (*Id.* at 9.) In describing the video of Worley and AD in their home, Evans stated "[t]hey were sitting extremely close to each other," and their conduct was of a "very intimate nature that you would see more with a partner versus a stepdaughter." (*Id.* at 9, 14.) Evans stated that she passed the videos along to law enforcement because she was "concerned of grooming-type behaviors between Mr. Worley and [AD.]" (*Id.* at 9.) Evans also testified that Worley was cooperative with the safety plan that she put into place in 2012, but "given the information that's available today, if [Worley] was to return to the home, a new assessment would be opened, and there would be a new DHS assessment conducted."[3] (*Id.* at 4, 7.)

On March 7, 2016, the jury in the Tillamook County trial found Worley "not guilty" on five counts and hung on the remaining 17 counts. (Decl. of Mae Lee Browning, ECF 102 ("Browning Decl."), ¶ 7.) The same day, the Tillamook County Circuit Court released Worley to the family home, where he was to remain on house arrest for the pending charges in Deschutes County. (*Id.*) On March 14, 2016, the Tillamook Court entered a judgment of dismissal upon the remaining 17 counts in response to the State's motion to dismiss. (*Id.* at ¶¶ 8-9.)

On March 23, 2016, Evans placed an anonymous phone call to DHS's child abuse hotline to initiate a new assessment of the children. (Evans Dep. 94:12-19, 97:21-98:5.) Evans was also assigned to investigate the case. (*Id.* at 102:18-19.) On March 24, 2016, at approximately 3:00 p.m., Evans went to the Worley residence unannounced. (*Id.* at 101:20.) The children were not at the home at the time because they were staying with Krista Rasey, a family friend, while Worley

---

[3] Evans was referring to sexual abuse allegations SW made in 2014, which occurred after Evans completed her 2012 threat of harm assessment and were new to Evans and her colleagues at the DHS Gresham office. (Decl. of Craig Johnson, ECF No. 83 ("Johnson Decl."), Ex. 3 at 8-10.)

OPINION AND ORDER – 5

and Davis went to Bend, Oregon earlier that day. (Decl. of Krista Rasey, ECF 104 ("Rasey Decl."), ¶ 5.) Worley and Davis elected not to speak with Evans and referred her to their attorney Richard Cohen. (Evans Dep. 104:6-9.) Evans returned to the DHS office to meet with her supervisors and telephone Cohen. (*Id.* at 105:24-106:4.)

Because Cohen was unavailable, Evans initially spoke with attorney Mae Lee Browning at approximately 4:15 p.m. (Browning Decl. ¶ 12.) Evans informed Browning that DHS would remove the children from the home and file a juvenile petition if Worley and Davis did not agree to a safety plan, and if Worley remained in the home that night. (*Id.* at ¶ 12.) Evans's demand that Worley leave that night was problematic because Worley was on house arrest and obtaining permission for Worley to move out was unlikely on such short notice. (*Id.* at ¶ 13.) Upon returning to his law office and speaking with Browning, Cohen placed a call to DHS at approximately 4:45 p.m., which Browning listened in on. (Declaration of Richard D. Cohen, ECF 103 ("Cohen Decl."), ¶ 4; Browning Decl. ¶ 15.) Evans and her supervisors, Cheryll Ramos and Amy Bertrand, were present on the call at DHS. (Evans Dep. 110:15-20.) Evans claims she did not "speak directly to Mr. Cohen;" rather, "he was speaking to either Cheryll Ramos or Amy Bertrand." (*Id.* at 110:13-17.)

During the brief call, Cohen informed the DHS employees that Worley and Davis would cooperate with safety planning. (*Id.* at 111:16-23.) Cohen assured Evans and her supervisors that the children were at Rasey's home, provided Rasey's address and telephone number, informed them that Rasey had substantial experience with children as a former Court Appointed Special Advocate, and assured DHS that they would have access to the children to verify they were safe. (Cohen Decl. ¶¶ 5-6; Browning Decl. ¶ 15; Evans Dep. 111:24-112:2.) An agreement was reached whereby the children would stay with Rasey that evening and, due to the lateness in the

day, Cohen and DHS agreed that if further safety planning was needed, they could discuss it the following day, Friday, March 25, 2016. (Browning Decl. ¶ 15; Cohen Decl. ¶ 7.)

Shortly after the phone call from Cohen, Evans called Rasey and asked if the children were with her. (Rasey Decl. ¶ 7.) Rasey confirmed she was with the children, and Evans informed her that she would send two DHS caseworkers over that evening to check on them. (*Id.*; Evans Dep. 114:10-14.) Evans also gave Rasey the following instructions: the children were to have no contact with Worley; Davis could talk with and visit her children, but only in Rasey's presence; and Davis could not take the children from Rasey's home. (Rasey Decl. ¶ 7; Evans Dep. 139:10-12.) That evening two DHS caseworkers went to Rasey's home and confirmed the children were there. (Rasey Decl. ¶ 8; Evans Dep. 116:24-117:6.)

On March 25, 2016, Evans submitted a signed affidavit in support of a protective custody order for the children in the Multnomah County Circuit Court. (Snyder Decl., Ex. C ("Evans Aff.").) Evans wrote, in relevant part, that "DHS attempted to speak to Mr. and Ms. Worley to create a safety plan, however both parents refused to speak to this worker. DHS placed a call to Mr. Worley's attorney, Rich Cohen, in an effort to work with the family to create a safety plan. At this time, DHS has not been able to gain cooperation from the family to ensure safety of the children." (*Id.* at 1.) The Multnomah County Court issued a warrant for protective custody of the Worley children based on Evans's affidavit, stating in the warrant that "DHS has attempted to create a safety plan to address concerns without success/cooperation on the part of the parents." (Snyder Decl., Ex. D at 2.) The court found protective custody was in the best interest of the children because "[Worley] has pending charges related to sexual abuse, a previous [illegible] of founded abuse allegations, [and Davis] is either unable or unwilling to protect the children[.]" (*Id.* at 3.) After the warrant issued, Evans informed Rasey the children had been placed into DHS

OPINION AND ORDER – 7

custody. (Rasey Decl. ¶ 10.) Later that day, Evans met Rasey at her home and fast-tracked paperwork to qualify Rasey as an emergency foster parent. (*Id.* at ¶ 11; Evans Dep. 120:8-10.)

On March 28, 2016, a shelter hearing was held before Referee Herzog at the Multnomah County Juvenile Justice Center. (Johnson Decl., Ex. 3.) After learning of Cohen's cooperation with DHS on behalf of his clients and their agreement to place the children with Rasey, Referee Herzog stated Evans's affidavit "was unclear and almost misleading." (*Id.* at 39-41.) Nonetheless, the Juvenile Court allowed the grant of temporary custody to DHS to continue based on Worley's history of "founded" sex abuse allegations made by HL and SW, and Davis's failure to recognize the risk to the children that Worley presented. (Johnson Decl., Ex. 6 at 2; *see also* Johnson Decl., Ex. 3 at 49-50.) Specifically, Referee Herzog found it was in the best interest of the children to be placed in a safe environment during the time DHS needed to conduct its assessment, and that temporary custody would remove "the potential for the children to be influenced by the parents during that time." (Johnson Decl., Ex. 3 at 50.) The referee left open the possibility of returning the children to Davis's care if Worley was able to change his pre-trial release terms to permit him to reside outside of his home. (Johnson Decl., Ex. 6 at 3.) Referee Herzog also granted Worley supervised visits with his children. (*Id.*)

On May 4, 2016, a re-hearing of Referee Herzog's shelter hearing decision was held before Judge Hehn. (Johnson Decl., Ex. 5.) Judge Hehn affirmed Referee Herzog's order based on the "totality of the evidence." (*Id.* at 86.) Specifically, the judge found the nature of HL and SW's allegations "extremely disturbing," and was concerned by some of Worley's behavior towards the children, presumably Worley's admission that he disciplined HL and SW by spanking them with a belt and pinching them, as well as his admission that on more than one occasion he urinated on SW while taking a shower with him. (*Id.* at 86; Johnson Decl., Ex. 4 at

2-3.) The judge additionally found custody warranted because there was "a lot of concern by court and official actors about the level of risk that [Worley] may pose to these children," noting Worley's pending Deschutes County indictment clearing a grand jury, the fact that his criminal charges "had to have gotten through some probable cause findings [made] by judges," and a prior no contact order with SW that was issued by Lane County. (Johnson Decl., Ex. 5 at 87-88.) Finally, Judge Hehn ordered the children returned to Davis on the following conditions: a safety plan be entered into with DHS; Worley had to move out of the family home; Worley could continue visiting his children in the presence of supervisors approved by DHS; and nobody, other than a professional with DHS's approval, could talk to the children about the case or the allegations made against Worley. (*Id.*)

On March 14, 2018, Worley was found guilty by a Deschutes County jury of seven felony charges and sentenced to 150 months in the custody of the Oregon Department of Corrections. (Johnson Decl., Ex. 1.)

*Legal Standard*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (2018). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported

OPINION AND ORDER – 9

conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. Fed. R. Civ. P. 56(c) (2018). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

## *Discussion*

Worley's claim, brought under 42 U.S.C. § 1983, alleges Evans deliberately fabricated evidence against him in violation of his substantive due process rights guaranteed under the Fourteenth Amendment of the United States Constitution. Specifically, Worley alleges Evans's investigatory statements and testimony at the Tillamook County trial concerning the internet videos of Worley and AD were deliberately fabricated. (Pl.'s Compl. 27; Pl.'s Resp. 16.) Worley

further alleges that Evans deliberately fabricated sworn statements submitted in an affidavit in support of a protective custody order for the children. The court addresses each in turn.

I. <u>Internet Videos</u>

Worley claims Evans "concoct[ed] false claims" in her investigation and trial testimony that internet videos showed an inappropriate relationship between Worley and AD, because no such videos exist. (Pl.'s Compl. 27.) Worley further alleges Evans lied to Davis about AD reporting Worley touched her on the thigh. (Pl.'s Resp. 15.)

"To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017) (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010)). "Fundamentally, the plaintiff must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015) (citations omitted).

A plaintiff can establish that the fabrication was deliberate in one of two ways. First, the plaintiff can introduce direct evidence that the defendant made "actual misrepresentations," such as evidence that the defendant "deliberately falsified statements in her investigative report and declaration." *Costanich*, 627 F.3d at 1111, 1113. However, "not all inaccuracies . . . give rise to a constitutional claim. Mere carelessness is insufficient, as are mistakes of tone." *Spencer*, 857 F.3d at 798 (internal citations and quotation marks omitted.) Second, but not relevant here, there are "two circumstantial methods" of proving the falsification was deliberate: (1) "the defendant continued his investigation of the plaintiff even though he knew or should have known that the plaintiff was innocent," or (2) "the defendant used 'investigative techniques that were so

coercive and abusive that he knew or should have known that those techniques would yield false information.'" *Bradford*, 803 F.3d at 386 (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc)).

To establish the second element of causation, the plaintiff must show that "the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct;" and "the act was the 'proximate cause' or 'legal cause' of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer*, 857 F.3d at 798 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012)). Although, "[e]rrors concerning trivial matters cannot establish causation, a necessary element of any § 1983 claim. And fabricated evidence does not give rise to a claim if the plaintiff cannot show the fabrication actually injured her in some way." *Id.* (internal citation and quotation marks omitted).

Evans first argues the court should grant summary judgment in her favor because in order to prevail on a Fourteenth Amendment substantive due process claim predicated on deliberately fabricated evidence, the plaintiff must have been convicted. (Defs.' Mot. Summ. J., ECF No. 79, at 7-8 ("Defs.' Mot.").) Evans contends that "nobody has deprived Plaintiff of his constitutionally protected interest in life or liberty when acquittal resulted." (*Id.*) Worley argues "the law of the Ninth Circuit is precisely the opposite," asserting "all malicious prosecution claims in Oregon, whether brought under state or federal law, require that the criminal proceeding result in an acquittal." (Pl.'s Resp. 13-14 (citing *Miller v. Columbia Cnty.*, 282 Or. App. 348, 360 (2016)).) Both arguments miss the mark.

To the extent Worley asserts his claim arises under a theory of malicious prosecution, that avenue was foreclosed by Judge Brown's prior Order finding "probable cause existed for

OPINION AND ORDER – 12

[Worley]'s arrest and prosecution." (Op. and Order, ECF 50, at 24.) As the court previously explained, "the existence of probable cause is an absolute defense to malicious prosecution." (*Id.* at 22 (citing *Lassiter v. City of Bremerton*, 556 F.3d 1049, 154-55 (9th Cir. 2009)).) Thus, Worley's reliance on the elements of a malicious prosecution claim is misplaced.[4] In the same vein, Evans's reliance on two federal habeas criminal appeals—which unsurprisingly involve a convicted criminal defendant—for the proposition that "inherent in all cases Defendant Evans could find is the requirement that . . . a criminal conviction must have resulted," is without merit. (Defs.' Motion 7-8.) Beside the fact that those cases make no mention of civil liability under § 1983, Evans reads into those cases a criminal conviction requirement that is simply not there. *See Henry v. Ryan*, 720 F.3d 1073, 1084-85 (9th Cir. 2013); *Phillips v. Ornoski*, 673 F.3d 1168, 1181-82 (9th Cir. 2012).

Indeed, the Ninth Circuit recently addressed this issue, noting that "circuits have split on . . . whether a deliberate fabrication of evidence claim necessarily fails if the plaintiff was acquitted." *Spencer*, 857 F.3d at 802 n.4; *see also Black v. Montgomery Cty.*, 835 F.3d 358, 371 & n.12 (3d Cir. 2016) (collecting cases), *cert. denied sub nom. Pomponio v. Black*, 137 S. Ct. 2093 (2017). Although the court declined to decide the issue in *Spencer* because the plaintiff was not acquitted, *id.*, the Ninth Circuit's previous discussion in *Devereaux* all but answered the question. There, the court held:

> Under *Pyle v. Kansas*, 317 U.S. 213, 216, 63 S. Ct. 177, 87 L. Ed. 214 (1942), the knowing use by the prosecution of perjured

---

[4] Worley's argument is somewhat understandable given the court's reference to Worley's surviving claim against Evans as "a § 1983 claim for malicious prosecution." (Op. and Order 17.) However, as the Ninth Circuit previously explained, "the right at issue in a *Devereaux* claim is the right to be free from criminal charges based on a claim of deliberately fabricated evidence. In this regard, it is similar to the tort of malicious prosecution, which involves the right to be free from the use of legal process that is motivated by malice and unsupported by probable cause." *Bradford*, 803 F.3d at 388 (internal citation and quotation marks omitted).

OPINION AND ORDER – 13

> testimony in order to secure a criminal conviction violates the Constitution. While *Pyle* does not deal specifically with the bringing of criminal charges, as opposed to the securing of a conviction, we find that the wrongfulness of charging someone on the basis of deliberately fabricated evidence is sufficiently obvious, and *Pyle* is sufficiently analogous, that the right to be free from such charges is a constitutional right.

*Devereaux*, 263 F.3d at 1075.

The en banc court's emphasis on the "right not to be subjected to *criminal charges* on the basis of false evidence," makes clear that the act of subjecting an individual to the criminal process itself is a significant liberty deprivation and cognizable under the due process clause of the Fourteenth Amendment. *Id.* at 1074-75 (emphasis added). Further, the Ninth Circuit has already implicitly signaled that an acquittal does not sound the death knell for a deliberate fabrication of evidence claim. *See Bradford*, 803 F.3d 382, 388 (9th Cir. 2015) (setting the accrual date for the plaintiff's *Devereaux* claim as the date of acquittal for purposes of the statute of limitations). Therefore, to the extent the Ninth Circuit's holdings in *Devereaux* and *Bradford* leave any ambiguity, this court follows the reasoning of the Second, Third, Fifth, and Eleventh Circuit Courts of Appeals, and holds a criminal conviction is not a prerequisite for a plaintiff bringing a § 1983 deliberate fabrication of evidence claim under the due process clause of the Fourteenth Amendment. *See, e.g., Zahrey v. Coffey*, 221 F.3d 342, 348 (2d Cir. 2000); *Black*, 835 F.3d at 371; *Cole v. Carson*, 802 F.3d 752, 771 (5th Cir. 2015) (relying, in part, on *Devereaux* to reject criminal conviction prerequisite), *vacated on other grounds sub nom. Hunter v. Cole*, 137 S. Ct. 497 (2016); *Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1328 (11th Cir. 2015).

Next, Evans argues that Worley's claim fails because the prosecutor must be the named defendant. (Defs.' Mot. 8.) Evans again cites federal habeas and criminal appeals cases that do

not support the proposition she advances. *See Sanders v. Cullen,* 873 F.3d 778, 794 (9th Cir. 2017); *United States v. Renzi,* 769 F.3d 731, 751-52 (9th Cir. 2014); *Soto v. Ryan,* 760 F.3d 947, 958 (9th Cir. 2014). Those cases discuss the elements a criminal defendant must establish to overturn a conviction obtained by way of false evidence, not civil liability under § 1983. Contrary to Evans's assertion, the Ninth Circuit has made clear that in the context of a § 1983 claim, "social workers are not entitled to absolute immunity from claims that they fabricated evidence during an investigation or made false statements in a dependency petition affidavit that they signed under penalty of perjury[.]" *Costanich,* 627 F.3d at 1109 (quoting *Beltran v. Santa Clara Cty.,* 514 F.3d 906, 908 (9th Cir. 2008)) (quotation marks omitted); *see also Awabdy v. City of Adelanto,* 368 F.3d 1062, 1067 (9th Cir. 2004). However, as Evans further argues—and Worley correctly concedes—Evans is entitled to absolute immunity for her witness testimony given at trial. *See Briscoe v. LaHue,* 460 U.S. 325 (1983); *Burns v. Cty. of King,* 883 F.2d 819, 822 (9th Cir. 1989). Therefore, the court is limited to analyzing Worley's claim based on Evans's pre-trial investigatory statements.

Accordingly, Evans next points to facts that undermine Worley's allegation that the video evidence was fabricated. Specifically, Worley admitted that he and AD would "make videos of [them]selves together doing silly father/daughter type things . . . quite often." (Johnson Decl., Ex. 2 at 60:12-21 ("Worley Dep.").) When asked during deposition whether Worley and his children would "peck" each other on the lips, defined as "briefly leaning [their] heads together, lips touching, making a kissing noise, and then separating," Worley answered that "[y]es, it would occur from time to time," but "it was only as we were saying good-bye." (*Id.* at 61:11-22; *see also* Snyder Decl., Ex. G at 12:7-17 ("AD Dep.") (AD describing "a peck on the lips" the same way).)

In an August 2012 interview with DHS, AD reported that Worley would take videos and post them on the internet through a social media app. (AD Interview 6.) When asked if she liked being in the videos, AD responded "it's fun . . . it's like, mess around in the car and we'll be singing and stuff and just goofing around." (*Id.* at 7.) When asked about the driving-to-school video specifically, AD asked "when we were singing in the car?" (*Id.* at 6.) AD later acknowledged that Worley kissed her on the lips in the video and asked Bertrand, "[i]s that unusual?" (*Id.* at 21.) She reported that kissing on the lips, cheek, and head were normal ways of showing affection in her family. (*Id.* at 14.) When asked during deposition "if someone told you that there was a video that existed . . . at one point in time of you and Mr. Worley . . . dropping you off at school where you were singing and being silly and then as you were leaving you gave him a peck good-bye, would that seem like . . . that could have happened," AD responded in the affirmative. (AD Dep. 12:18-13:6.) Furthermore, Bertrand and Chambers specifically recall seeing the driving-to-school video shortly after Evans found it on the internet, and Bertrand remembers seeing at least one other internet video of Worley, although she does not recall the details of the video(s). (Bertrand Decl., ECF 80, at 2; Chambers Dep. 27:2-25, 31:10-18.)

Worley does not address Evans's argument or the admissions made by himself and AD regarding their conduct in the videos. Instead, Worley baldly asserts that "[s]uch videos never existed." (Pl.'s Resp. 16)[5] To the extent Worley is contesting Evans's characterization of his conduct, his claim fails, because "questions of tone or characterization" do not equate to fabricated evidence. *Costanich*, 627 F.3d at 1113.

---

[5] At oral argument, however, Worley's counsel conceded the driving-to-school video existed. Nonetheless, counsel reiterated Worley's disagreement with Evans's description of the kiss good-bye as inappropriate and her opinion that the videos showed Worley engaging in sexual grooming-type behaviors.

OPINION AND ORDER – 16

Furthermore, Worley's assertion that Evans fabricated the existence of the videos is unavailing. Worley has failed to "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Although the court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion," *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citation omitted), Worley "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586. Worley's conclusory denial of the existence of the videos, which objectively depicted conduct that he and AD have admitted to under oath, does not create a genuine issue of material fact. *See F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("In order to avoid summary judgment, a non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor. A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment.") (citations omitted) (emphasis in original). And, given the evidence substantiating that the videos existed, the fact that they were never produced at trial does not support the inference that Evans invented them. *Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Finally, assuming for the sake of argument that the videos never existed and Evans completely made-up the events she described, summary judgment would nevertheless be warranted because Worley cannot establish that the deliberately fabricated evidence was the cause in fact of the criminal charges brought against him. *Spencer*, 857 F.3d at 798. Worley's unsupported assertion that Evans's fabricated statements were "clearly instrumental in the

initiation of criminal proceedings" strains credulity beyond the breaking point. (Pl.'s Resp. 16.) The charges filed against Worley in Tillamook and Deschutes Counties were based entirely on HL and SW's allegations that Worley sexually abused them, and the conduct in the videos between AD and Worley was not included in any of the criminal charges brought against Worley. (Pl.'s Compl. 14-16.)

Finally, there is no reasonable inference that Evans lying to Davis about AD reporting Worley touched her on the thigh could have been the cause in fact of charges being brought against Worley. No reasonable jury could find that, but for Evans's statements concerning the videos, Worley would not have been subjected to criminal charges based solely on HL and SW's allegations. *See Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 587. Therefore, the court grants Evans's motion for summary judgment as to Worley's claim of deliberate fabrication regarding the internet videos.

II.  March 25, 2016 Affidavit

Worley claims Evans made false and misleading statements in her March 25, 2016 affidavit, stating that "DHS has not been able to gain cooperation from the family to ensure safety of the children." (Evans Aff. 1.) Worley further alleges that Evans falsely claimed in her affidavit "that she did not know where JW and JW were." (Pl.'s Compl. 20; *accord* Pl.'s Resp. 18.)

Plaintiffs have "a Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a civil child abuse proceeding." *Costanich*, 627 F3d at 1115. This is also referred to as a claim for judicial deception. *See Chism v. Wash. State*, 661 F.3d 380, 386 (9th Cir. 2011). For a judicial deception claim to survive summary judgment, a plaintiff "must make (1) a 'substantial showing' of deliberate falsehood or reckless disregard for the truth, and (2)

establish that but for the dishonesty, the challenged action would not have occurred. If a plaintiff satisfies these requirements, 'the matter should go to trial.'" *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (citation omitted); *see also Greene v. Camreta*, 588 F.3d 1011, 1035 (9th Cir. 2009), *vacated in part*, 563 U.S. 692 (2011), *and vacated in part*, 661 F.3d 1201 (9th Cir. 2011). "Materiality is for the court, state of mind is for the jury." *Id.* (citing *Hervey v. Estes*, 65 F.3d 784, 789 (9th Cir. 1995)).

As a preliminary matter, Evans never claimed "she did not know where the children were"; no such statement appears in her affidavit. (*See* Evans Aff.) Thus, any claim based on that erroneous allegation fails.

Evans first argues that her perception of Worley's cooperation "amounts to a subjective characterization and not an 'actual misrepresentation.'" (Defs.' Mot. 11 (quoting *Costanich*, 627 F.3d at 1113.) Given Cohen's cooperation with Evans on behalf of his client Worley, their agreement that the children would stay with Rasey for the evening, and the fact that two DHS workers later confirmed that the children were with Rasey, the court finds whether Evans made deliberate misrepresentations in the affidavit is a disputed issue of material fact. Accordingly, the court declines to grant Evans summary judgment on that basis.

Evans next argues that her statements in the affidavit were immaterial as a matter of law. To determine whether a false statement was material, "the court purges those statements and determines whether what is left justifies issuance of the warrant." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009). A review of the affidavit establishes that Evans's statements were immaterial to the issuance of the warrant for protective custody for the same reasons that Referee Herzog and Judge Hehn affirmed the original protective custody order. (*See* Johnson Decl., Ex. 3 at 49-50, Ex. 5 at 86-88, Ex. 6 at 2; Decl. of Craig Johnson, ECF No. 107, Ex. 10.)

Specifically, Worley's then-pending criminal sex-abuse charges in Deschutes County, Worley's previous history of "founded" allegations by DHS, Davis's failure to appreciate the risk Worley posed to the children, SW's allegations made after Evans closed her 2012 assessment, and DHS's need for adequate time to assess the safety of the children supported the juvenile court's finding of probable cause to issue the protective custody warrant. Evans included those reasons in her original affidavit. (Evans Aff. 1-3.) Accordingly, the court grants Evans's motion for summary judgment because her allegedly false statements in the affidavit were immaterial to the issuance of the protective custody order.[6]

## Conclusion

Evans's Motion (ECF No. 79) for Summary Judgment is GRANTED and this action is DISMISSED with prejudice.

IT IS SO ORDERED

DATED this 16th day of January, 2019.

JOHN V. ACOSTA
United States Magistrate Judge

---

[6] Because summary judgment in Evans's favor is warranted on the issue of materiality, the court need not address her arguments based on issue preclusion. (*See* Defs.' Mot. 13-16.)

OPINION AND ORDER – 20